**INDEPENDENT PRODUCTIONS COR-
PORATION and IPC Distributors,
Inc., Plaintiffs,**

v.

**LOEW'S, INCORPORATED, et al.,
Defendants.**

United States District Court
S. D. New York.

May 20, 1959.

See also 148 F.Supp. 460; 22 F.R.D. 266.

Rosston, Hort & Brussel, New York City, for plaintiff Independent Productions Corp.

George Brussel, Jr., New York City, for plaintiff IPC Distributors, Inc.

Schwartz & Frohlich, New York City, for defendants Columbia Pictures Corporation and Columbia Pictures International Corporation.

Sidney Schreiber, New York City, for defendants Motion Picture Association of America, Inc. and Association of Motion Picture Producers, Inc.

Louis Phillips, New York City, for defendants Paramount Pictures Corporation, Paramount International Films and Paramount Film Distributing Corporation.

Benjamin Melniker, New York City, for defendants Loew's Incorporated and Loew's International Corporation.

Royall, Koegel, Harris & Caskey, New York City, for defendants Twentieth Century Fox Film Corporation, Twentieth Century Fox International Corporation and Twentieth Century Fox Inter-America, Inc.

Robert W. Perkins, New York City, for defendants Warner Bros. Pictures, Inc., Warner Bros. Pictures International Corporation and Warner Bros. Pictures Distributing Corporation.

Michael F. Mayer, New York City, for defendants Arthur Mayer and Council of Motion Picture Organizations, Inc.

Adolph Schimel, New York City, for defendants Universal Pictures Company, Inc., Universal Film Exchanges, Inc. and Universal International Films, Inc.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants United Artists Corporation, Eagle Lion Classics, Inc., National Screen Service Corporation, Comedia Enterprises, Inc. and City Entertainment Corporation.

Theodore R. Black, New York City, for defendants Republic Productions, Inc., Republic Pictures Corporation and Republic Pictures International Corporation.

William B. Jaffe, New York City, for defendants Allied Artists Pictures Corporation, Allied Artists International Corporation and Allied Artists Distributing Corporation.

J. Miller Walker, New York City, for defendant RKO Teleradio Pictures Inc. (formerly known as and referred to in the complaint as RKO Radio Pictures, Inc.)

Simpson, Thacher & Bartlett, New York City, for defendant Atlas Corporation (Successor by merger to RKO Radio Pictures Corporation).

Frederick W. R. Pride and Charles F. Young, New York City, for defendants Fox West Coast Theatre Corporation and Fox West Coast Agency Corporation. Myles J. Lane, New York City, Georgiana Koenig, Brooklyn, N. Y., Bernard R. Sorkin, Brooklyn, N. Y., of counsel.

Spivak & Kantor, New York City, for defendants Richard F. Walsh and John J. Francavilla.

Cahill, Gordon, Reindel & Ohl, New York City, for defendant Radio Corporation of America.

SUGARMAN, District Judge.

Plaintiffs, Independent Productions Corporation and IPC Distributors, Inc., are the producer and distributor, respectively, of a motion picture film entitled "Salt of the Earth".

On June 21, 1956, the complaint herein was filed charging defendants with participation in a conspiracy directed against the plaintiffs' production and distribution of the above-named film. Substantial damages under the Clayton and Sherman Acts, 15 U.S.C.A. § 1 et seq., are sought.

Plaintiffs contend that defendants embarked upon a two-phased conspiracy. In their brief on this motion they state:

"The first phase began in 1947 with the openly declared and widely publicized industry wide boycott of the Hollywood Ten in 1947.

"On November 25, 1947, the major motion picture producers joined as defendants herein, represented by their industry association, defendant Motion Picture Association of America, publicly announced that, although their action was not authorized by law, the industry would

discharge and would not re-employ the ten screen writers and directors who had been cited for contempt of the House of Representatives for refusal to testify before the un-American Activities Committee. This announcement came to be known as 'The Waldorf Declaration' because the industry meeting at which it was approved took place at the Waldorf-Astoria Hotel in New York City. The Declaration was promptly published in the New York Times, all of the motion picture industry trade publications and in other periodicals and newspapers throughout the country. Its text appears in Exhibit G annexed to plaintiffs' moving papers.

"Among the 'Ten' was Herbert Biberman, well-known motion picture and stage director who subsequently directed 'Salt of the Earth'. This admitted and industry-sponsored boycott was extended to other motion picture industry personnel as they declined to testify. Among this group was Paul Jarrico who produced 'Salt of the Earth' and Michael Wilson who wrote the screen play. Messrs. Jarrico and Wilson are well-known screen writers who had written or co-authored successful screen plays for several of the major studio defendants. * * *

"The second phase of the conspiracy began in 1952 when it became known that plaintiff Independent Productions Corporation ('Independent') utilizing the services of Messrs. Biberman and Jarrico and other blacklisted personnel who had been unable to secure any industry employment, had set about the production of 'Salt of the Earth' as an independent producer. When it became known that blacklisted personnel were helping Independent to make the picture, the 1947 conspiracy was extended to Independent and

to its motion picture. When IPC attempted to distribute the picture in 1954, the conspiracy was further extended to include distribution and exhibition of the film.

"During this second phase those defendants who are processors of sound film joined the conspiracy the object of which then became (1953) to make the production of the film, if plaintiffs were to succeed in producing it, as difficult and expensive as possible * * * Associated in this phase were representatives of International Alliance of Electrical and Stage Employees (IATSE) who refused to furnish the skilled labor required for production and exhibition.

"The Chicago Case

"As a result of the refusal of IATSE to furnish projectionists an action was brought by IPC against a Chicago IATSE local union and others who had interfered with a contract between IPC and a Chicago exhibitor for the showing of 'Salt of the Earth'. When that action was instituted in 1955 Biberman and Jarrico were, respectively, President and Secretary-Treasurer of Independent and of IPC, and were in general charge of their affairs.

"In March 1956, two months after present counsel were retained to prosecute this action and three months before it was commenced, Biberman refused to answer as irrelevant certain interrogatories propounded by the defendants in that action * * *. Because of that refusal the complaint was dismissed.

"At the time this occurred plaintiffs' counsel were drafting the complaint in this action. When consulted about implications of the dismissal of the Chicago case, they advised against the institution of this action until all officers of both plaintiffs who might be unwilling to testify in this action had disassociated

as officers or managing agents of the plaintiffs. * * * In turn, plaintiffs' counsel were advised that this would create no problem because all of the then officers of the plaintiffs were anxious to resign for personal and family reasons and that others were available to succeed them. * *

"Accordingly, plaintiffs' counsel prepared the resignations of plaintiffs' officers and directors and personally witnessed Biberman's * * Biberman resigned as President and director of Independent on May 17, 1956 and as President and director of IPC on May 6, 1956; and Jarrico as director and Secretary-Treasurer of both plaintiffs on May 31, 1956 * * *. All four resignations were acknowledged before notaries public and the regularity of their execution is not challenged."

*     *     *     *

The papers in support of this motion by plaintiffs to vacate defendants' notices to take plaintiffs' depositions by Biberman and Jarrico portray the following background. Independent is a California corporation organized in 1952. IPC is a New York corporation organized in 1954 to distribute the film "Salt of the Earth". Herbert Biberman became president of Independent in 1953. Although he is not and never was a stockholder of record of Independent, he has some well-founded expectation of participation to the extent of 10 per cent in the division of such assets, if any, as Independent shall ever acquire. It appears that the only present prospect of Independent's acquisition of assets of any real value lies in the possibility of recovery in the instant action.

It is asserted that in 1951 Biberman had conceived the idea of organizing an independent motion picture producing corporation which, among other things, would afford employment opportunities on the basis of talent and ability to those blacklisted industry employees who, like himself, were unable to secure employ-

ment in the industry as a result of the "Waldorf Declaration" and the continued industry boycott which followed its promulgation. He succeeded in interesting one Simon Lazarus and others in advancing the initial funds and they, their friends and Jarrico borrowed the balance of the amount initially deemed necessary to produce "Salt of the Earth". Lazarus became the first president of Independent.

None of the persons actively associated with the writing, production and direction of the film had drawn personal salaries or other compensation up to the time of the effort to exhibit the film. All of them had been unemployable in the motion picture industry as a result of the 1947 boycott and the events which followed. Because of the long periods of unemployment and of nonproductivity, Biberman's personal resources had been exhausted and he required an independent source of income to provide for his family. From 1954 on he earnestly desired to terminate his responsibility to Independent and to IPC, but because of his sense of obligation to Independent's loan obligees, he subordinated his desire further to be relieved of officer-employee responsibility to Independent, to what he considered to be his moral obligation to the many persons who had advanced large sums in reliance upon his and his associates' professional skills and the expectation of the completion and distribution of the film.

Throughout 1954 and 1955 Biberman was told by Wilson and Jarrico that they both had similar problems and felt the same responsibility. The result was that throughout 1954 and 1955 all of Independent's executives (Jarrico, Wilson and Biberman) carried on their duties and withheld the resignations each of them desired to submit. By the end of 1955, by which time it had become clear that the film could not be successful until the alleged conspiracy was either abandoned or enjoined, each of them had become sorely pressed to find remunerative em-

ployment to provide for their basic family living requirements.

In January 1956, before the complaint in the Chicago action was dismissed, Biberman retained the firm of Rosston, Hort and Brussel to institute this action on behalf of both plaintiffs. However, for this purpose, funds had to be secured and a complaint drafted and while efforts along these lines were being carried on the complaint in the Chicago action was dismissed.

Biberman was then advised that his refusal to respond to the interrogatories he had considered irrelevant in the Chicago action had impaired his usefulness to the plaintiff corporation since a similar situation might arise in this action. Under these circumstances he decided that his obligation and those of the other officers and directors now permitted and, indeed, required them to resign and to sever all connections with the plaintiffs. He believed that their resignations would be beneficial rather than damaging to the plaintiffs particularly from the standpoint of minimizing the legal and technical obstacles which might otherwise stand in the way of securing a determination in this action upon the merits with respect to plaintiffs' claims for damages and injunctive relief through which they might realize on their only asset, the motion picture "Salt of the Earth". He discussed the matter with Jarrico and wrote Wilson about it. Both agreed and tendered their resignations.

At the time he resigned there was relatively little business being carried on by either plaintiff. Independent had completed the production of "Salt of the Earth" and was planning no other productions until this action (then in contemplation) was brought to trial. IPC was negotiating with some foreign distributors and renting the film to various public and private groups in the United States, an activity which he knew Lazarus could handle with a minimum of assistance from him during a short transition period.

On May 17, 1956, Biberman resigned from all offices in Independent and on May 6, 1956 he resigned all offices in IPC.

Jarrico who had been a director and secretary-treasurer of Independent from March 31, 1953 and a director and secretary-treasurer of IPC from February 25, 1954 resigned all of those offices on May 31, 1956. Approximately one year prior to his resignation, Jarrico's activities on plaintiffs' behalf had almost ceased. During that year he did continue to maintain their financial records and to handle correspondence with some of their creditors. At various times during 1955 and early in 1956 when Biberman declared his unwillingness to continue as an officer of both plaintiffs, Jarrico, although he had continued to remain an officer of both corporations and was aware of their status, felt no inclination to succeed Biberman. Simon Lazarus, who as above stated had been the first president of Independent Productions Corporation, had several times expressed a willingness to resume his former position. Biberman and Jarrico felt that since Lazarus was an experienced and astute business man with considerable knowledge of the business and had been kept informed of its activities through the years, he would be the best choice to take over management of the companies.

During May 1956, when Biberman was about to relinquish his position as president, Ben Margolis, an attorney, advised Biberman, Jarrico and others that they might have to testify as officers and directors of the plaintiff companies in this action (then in contemplation). He further advised them that their refusal to testify about their political beliefs might be harmful to the plaintiff corporations in the suit and that if they were to invoke the Fifth Amendment in this action the corporations' instant complaint might be dismissed as in the Chicago suit.

They then agreed that they would resign their offices in both companies at once. As far as the actual operation of

both corporations was concerned this decision it is said meant very little because Biberman and Jarrico were otherwise gainfully employed elsewhere and performed little or no functions for the plaintiffs.

Except for some casual and sporadic consultation by Lazarus, it is asserted that Biberman and Jarrico at no time since they resigned in May 1956 have determined corporate policies or been consulted with respect thereto, administered or managed corporate business or signed any checks of either corporation.

It appears that Jarrico like Biberman will share in any recovery realized from the instant litigation. Jarrico's interest is 5 per cent thereof.

\*    \*    \*    \*    \*    \*

█ Based on the foregoing asserted facts plaintiffs now move for an order "pursuant to § 30(b) of the Federal Rules of Civil Procedure [28 U.S.C.A.] debarring defendants from taking the depositions of the plaintiffs by Herbert Biberman and Paul Jarrico and vacating all notices of depositions heretofore served upon the attorneys for the plaintiffs by the defendants or any of them to the extent that such notices seek the depositions of the plaintiffs by and through Herbert Biberman and Paul Jarrico as officers, directors or managing agents of the plaintiffs."

There can be no dispute that neither Biberman nor Jarrico is now an officer or director of plaintiffs. The parties agree (as plaintiffs state in their brief) that there is left "for this court's determination a single question viz.: Are Biberman or Jarrico managing agents within the meaning of the Federal Rules?"

The approach to the question of who is a managing agent must be pragmatic.[1]

The rules read in pertinent part:

F.R.Civ.P. 26:

"a. When Depositions May Be Taken. Any party may take the testimony of any person, including a party, by deposition upon oral examination or written interrogatories for the purpose of discovery or for use as evidence in the action or for both purposes. \*  \*  \*

\*    \*    \*    \*    \*    \*

"d. Use of Depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions: \*  \*  \*

"(2) The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing agent of a public or private corporation, partnership, or association which is a party may be used by an adverse party for any purpose."

Basically plaintiffs' argument is that the plain meaning of the rules precludes taking the deposition of a corporate party by a witness unless the witness be a "managing agent" of the examined party at the time of the taking of the deposition. The weaknesses of the "plain meaning rule" have been so well and so thoroughly explained as to require no elaboration here.[2] It will suffice to observe that the courts have approached the problem of determining who is a "managing agent" within the purview of the rules on an *ad hoc* basis, giving nominal approval to the proposition that a corporate party may be ex-

---

1. 4 Moore's Fed.Prac. (2d ed.) p. 1192; Bernstein v. N. V. Nederlandsche-Amerikaansche, etc., D.C.S.D.N.Y.1953, 15 F.R.D. 37.

2. Cf. Massachusetts Bonding & Ins. Co. v. United States, 352 U.S. 128, 138, 77 S.Ct. 186, 1 L.Ed.2d 189.

amined only through one who at the time of the deposition is its agent.[3] The instant motion will be considered against the background of these decisions.

In Newark Insurance Co. v. Sartain [4] Judge Halbert reviewed the authorities on the meaning of the term "managing agent" as used in F.R.Civ.P. 26(d)(2). He mentioned the absence of any guidance from appellate courts for the district courts to follow in concluding whether witnesses were to be deemed managing agents of other persons.

However, Judge Halbert ruled that given other basic factors, viz., knowledge by the witness of relevant facts and status of the witness as a person other than a common employee, i.e., with at least a consciousness of the problems of management and an incentive to promote the interests of management, the paramount test to be applied is "Can [the witness] be expected to identify himself with the interests of his principal rather than those of the other party?" In this ruling I am in complete accord.

The purpose of Rule 26(d)(2) is to protect a party from the admissions of a disgruntled former employee.[5] In Curry v. States Marine Corporation of Delaware, supra, note 3, Judge Walsh was presented with a motion to vacate the notice to examine the defendant corporation through the person who at the time of occurrence of an accident was master of one of its vessels. At the time of the ruling, the witness was an employee recognized by Judge Walsh as not occupying the conventional status of "managing agent". In denying the motion, Judge Walsh noted the absence of any danger

that the witness might through animus make admissions against the moving defendant. He concluded that the witness would identify defendant's interests with his own because the witness was still in defendant's employ as chief mate. He found that the witness was defendant's managing agent at the time of the accident; "he should be the person to explain the defendant's position now, unless defendant has a basis for withholding the confidence it previously placed in him."

Judge Palmieri attained the same result on similar facts in Klop v. United Fruit Company.[6]

On a similar theory, Judge Swaim writing for a majority of the panel in O'Shea v. Jewel Tea Co.[7] affirmed the trial court's holding in effect that a former employee of the defendant was its "managing agent" within the meaning of F.R.Civ.P. 43(b). The witness, one Carlson, was the manager of the defendant's store where the accident occurred. Prior to the trial, the witness left the service of the defendant and at once started working for another company. However, it was obvious at the trial that Carlson "still considered himself a member of the defendant's camp" and the trial court properly found him to be defendant's managing agent and examinable as an adverse (not merely hostile) witness.

Judge Weinfeld has said in a leading case on this subject: [8]

"A managing agent, as distinguished from one who is merely 'an employee' is a person invested by the corporation with general powers to exercise his judgment and discretion in dealing with corporate mat-

3. See Curry v. States Marine Corporation of Delaware, D.C.S.D.N.Y.1954, 16 F.R.D. 376, 377.

4. D.C.N.D.Cal.1957, 20 F.R.D. 583, 586.

5. 4 Moore's Fed.Prac. (2d ed.) pp. 1190–1191.

6. D.C.N.Y.1955, 18 F.R.D. 310.

7. 7 Cir., 1956, 233 F.2d 530.

8. Krauss v. Erie R. Co., D.C.S.D.N.Y.1954, 16 F.R.D. 126, 127. See also Warren v. United States, D.C.S.D.N.Y.1955, 17 F.R.D. 389.

ters; he does not act 'in an inferior capacity' under close supervision or direction of 'superior authority.' He must be a person who has 'the interests of the corporation so close to his heart that he could be depended upon to carry out his employer's direction to give testimony at the demand of a party engaged in litigation with the employer.'

"Each situation is governed by its own facts. * * * "

With that realistic and practical backdrop, Biberman and Jarrico are in a very real sense even now in the "employ" of the plaintiffs although formal ties are broken. It cannot be denied that they stand ready to serve the plaintiffs should the plaintiffs require their talents. After his resignation as an officer of plaintiffs in May 1956 Biberman actually did so down to as late as February 6, 1957.[9] It is inconceivable on the evidence presented that if a situation arose requiring action by Biberman and Jarrico in furtherance of plaintiffs' interests, they would not gladly take such action. They have unique knowledge of relevant matters. At the time of the acts complained of, they were officers, directors and managing agents of the plaintiff corporations. Plaintiffs cannot now relieve themselves of whatever liabilities accrue through Biberman's and Jarrico's past and present relationships with the corporate entities. To the extent that the plaintiffs' affairs required management since Biberman's and Jarrico's resignations I am satisfied that they participated therein to an extent that for all practical purposes made them "managing agents" of the plaintiffs.

The motion is denied.

Settle an order setting a time and place mutually agreeable to counsel for the depositions to proceed.

9. The notices sought to be vacated originally set the examination dates as July 25, August 13 and October 26, 1956 and March 13 and 15, 1957.