UNITED STATES of America, Appellee,

v.

George T. KATTAR,
Defendant, Appellant.

No. 87–1172.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1987.

Decided Feb. 22, 1988.

Michael Avery with whom Ellen K. Wade and Avery & Friedman, Boston, Mass., were on brief, for defendant, appellant.

Gary C. Crossen, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

COFFIN, Circuit Judge.

Appellant George Kattar was indicted in 1986 on three counts of wire fraud, one count of stolen or fraudulently taken monies, and one count of extortion under the Hobbs Act (18 U.S.C. § 1951). The trial court granted a motion for judgment of acquittal on one of the fraud counts at the close of the government's case. Following a thirteen-day trial, the appellant was acquitted of all remaining counts except the extortion charge, on which he was convicted. He appeals from that judgment of conviction.

### I.

Because of the complicated nature of appellant's argument on appeal, it is necessary to marshal the facts of the case in some detail.

In June 1982, someone attempted to pass a counterfeit $2,000,000 check drawn on the account of L. Ron Hubbard, the founder and, until his recent death, the head of the Church of Scientology. This attempt failed. The check was part of a scheme concocted by a former attorney named Larry Reservitz, who had access to genuine checks and inside information at Hubbard's bank, the Bank of New England. The government soon discovered that the check scheme was Reservitz's brainchild. The government subsequently enlisted Reservitz for assistance in investigations of the Church. The government evidently suspected that the Church was attempting to obtain false incriminating testimony regarding the check scheme in order to discredit certain individuals. Reservitz, himself not a member of the Church, was sent undercover to acquire information concerning the Church's own investigation of the Hubbard counterfeit check scheme.

At some point in 1984, an attorney named Michael Flynn, considered by the Church to be an enemy of Scientology, alerted a probate court to the check scheme, as evidence of serious mismanagement of Hubbard's funds by the Church. The Church responded to Flynn's charges by stepping up its own investigation of the check forgery.

Geoffrey Shervell was put in charge of the Church's investigation. Shervell, who testified as a government witness in this case, oversaw the investigation in his capacity as Director of Scientology's Investigation Section. The Church ran advertisements in several major newspapers, including the Boston Globe, offering a $100,000 reward "for information leading to the arrest and conviction of the person or persons responsible for the forgery and attempted passing of [the] check." Shervell employed private investigators to look into the check scheme. Some evidence was adduced at trial that these investigators, particularly Eugene Ingram, suborned false statements from various persons in order

* Of the District of Massachusetts, sitting by designation.

to implicate Flynn himself in the check forgery. The statements against Flynn were given substantial play in the Church's newspaper, *Freedom*. The Church also publicized these allegations in a number of press conferences.

Shervell was removed from the check scam investigation for several months due to his "ineffectiveness" in procuring information, but was reinstated by the Church in August 1984. At this point Reservitz, the actual mastermind of the check scheme, became a cooperating witness and operative of the government. Reservitz testified that he approached Church investigators to see if they would attempt to procure false testimony from him. In effect, he was to be bait for possible illegalities by the Church. Church investigator Ingram did in fact try to get Reservitz to implicate Flynn. Reservitz, while wearing a body recorder provided by the FBI, negotiated with the Church investigators about how much he was to be paid for his incriminating statements.

At about the same time, Shervell had contacted Harvey Brower and appellant George Kattar for further leads in the check investigation. Brower persuaded Shervell that Kattar had information which might be helpful. Brower also said that Kattar had other information about Flynn that might interest the Church. Eventually, in September, Brower reported to Shervell that Kattar would provide information relating to the check scheme in exchange for the $100,000 reward payment. The negotiations went back and forth for a while, and there is much dispute over the exact understanding each party had as to the terms of any agreement they might enter into. Shervell seemed reluctant to part with the $100,000 without more assurance from Kattar about the content of his information, while Kattar insisted on a guarantee of payment before he would provide any statement. Shervell did testify that Kattar at one point told the Church investigators something to the effect of "I know what you want, I have the information you have advertised for. I know you want Flynn and I can get that information for you."

After several meetings with Brower, Kattar's intermediary, Shervell was told that Kattar would provide the information pursuant to an initial payment of $33,000, which was to represent a good faith demonstration of the Church's willingness to part with the reward money. The $33,000 was to be placed in an escrow account, to be withdrawn by Kattar after the conditions of the agreement had been met. Shervell did not respond immediately to this plan. Brower then contacted Shervell to convey that Kattar was angry with the delay. Brower told Shervell that if the $33,000 was not provided within two days, Kattar would go to Flynn and tell him that the Church had tried to bribe him into giving false information about Flynn. At this point, the Church authorized the $33,000 payment to Brower to be placed in escrow. According to Shervell, he gave the money to Brower, on the understanding that it would be shown to Kattar, and then returned to Shervell pending Kattar's revelation of the information. However, Brower apparently never returned the money to Shervell.

At a meeting the next day, Kattar provided Shervell information that merely reiterated what the Church already knew about the check fraud. Shervell told Brower that he was dissatisfied with this worthless information, and asked for the $33,000 back. Brower called Shervell back to inform him that Kattar was furious with the suggestion that the money be returned. Shervell testified that Brower conveyed a threat by Kattar that if the demand for repayment were pressed, then Kattar would tell Flynn that the money had been paid to Kattar as a contract on Flynn's life.

At this point, Shervell contacted the FBI. Arrangements were made for Special Agent George DiMatteo to go undercover as a Church associate of Shervell's.

DiMatteo accompanied Shervell to a meeting with Kattar on October 2, 1984. Both Shervell and DiMatteo testified that Kattar was incensed at that meeting. DiMatteo testified about Kattar's actions at the meeting as follows:

He said he was in charge of the rackets in that area, that he had unchallengeable power, that he had worked with several people in that area, that when he made money everyone had to make money. He said that he held our fate, not in these words, but in his hands. He told us that if we were not more receptive to his way of doing business that he, quote, "would throw our names in the hat."

DiMatteo testified that Kattar used a threatening tone of voice and threatening gestures at this meeting. Kattar acknowledged receiving the $33,000, and demanded that the additional $67,000 be paid at their next meeting, claiming that he would there provide information that would be useful to the Church. According to DiMatteo, Kattar directed Shervell and DiMatteo "not to go to the Feds," because his power "was unchallengeable in that area" as well.

On the next day, Kattar had a meeting with Larry Reservitz to discuss information that Kattar could give to the Church. Kattar and Reservitz had previously discussed the check fraud when that scheme was in its incipiency, so Kattar knew that Michael Flynn was not part of it. Kattar also knew that Reservitz was a source for details about the scheme. On October 3d, Kattar did not know that Reservitz was working for the government and equipped with a hidden body recorder. Kattar and Reservitz discussed the fact that the Church would not release the $67,000 unless Kattar provided the name of someone at the Bank who might have been involved in the check scheme. They agreed that this name would have to be that of someone who was not in fact part of the scheme, so as to protect Reservitz. On the tape of this meeting, Kattar is overheard describing to Reservitz his meeting the day before with the Church representatives:

> I says you gotta fuckin' deal with me— you're not gonna back out. Your whole fuckin' church is coming down. I wasn't bullshitting.
>
> · . . . .

I said I'll break your fuckin' head you motherfucker. You gonna deal with me —you fuckin' better.[1]

Later that same day, Reservitz met again with Kattar. On this occasion they discussed at length the fabricated information Kattar was to give to the Church. Kattar reiterated that he had warned Shervell that "I'll break your fuckin' head." Shervell also testified that these various threats had been made.

The next day, October 4, 1984, Shervell and DiMatteo again met with Kattar. DiMatteo wore a body recorder to this meeting. Kattar provided the phony information he had concocted with Reservitz, including that Flynn had helped plan the check scheme in order to create bad publicity for the Church in his campaign against it. Kattar explained that this information would "bury" Flynn. Although Kattar did not directly threaten DiMatteo and Shervell at this meeting, he made it quite clear that he had substantial muscle at his service. For instance, he suggested that his strong-arms had used their powers of persuasion to get the information, and that he commanded much power and respect in "our business" and "our family." He made numerous remarks as to how he would use physical force in retribution if his sources and others had deceived or crossed him in any way. Kattar agreed to give the Church a week to verify the information, after which he expected to receive the remaining $67,000. It is unclear from the tapes whether the "deal" that was struck between Kattar and the Church was that Kattar would provide the true information about the check scheme, or whether Kattar was merely to provide information which would "stick" against Flynn.

Later that day, Kattar and Reservitz spoke on the telephone, and Kattar bragged that "I belong in Hollywood."

A secretary for the Church in Los Angeles testified that she received a phone call on October 18, 1984, from a person identifying himself as George Kattar. The caller allegedly left a message that "if we

---

1. These quotations are adapted from the transcripts provided to the jury. Those transcripts were not themselves in evidence, though the underlying tapes were.

don't hear from Geoff [Shervell], they are all going to the other side." The government argued that this comment was a threat that Kattar would go to Flynn if he didn't receive the money.

At this point, the FBI told the Church to desist in its investigation. The Church evidently did not forward the $67,000 to Kattar, and there is no evidence in the record that the Church ever used Kattar's information in any way.

The government charged Kattar and Brower with attempting to defraud the Church by giving it false information in exchange for a reward fee, 18 U.S.C. §§ 1343, 2315, and with extortion under the Hobbs Act, 18 U.S.C. § 1951. Both defendants were acquitted on all fraud charges. Brower also was found not guilty of extortion. Kattar, however, was found guilty on the extortion count. Kattar now challenges his conviction on a number of grounds, including improper instructions to the jury, the government's use of false and deceptive testimony, and the exclusion of out-of-court statements helpful to his defense.

## II.

In order to understand appellant's contentions in this appeal, it is necessary to set forth briefly his theory of defense to the extortion charge at trial. The Hobbs Act, 18 U.S.C. § 1951, defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Certain threats of economic harm, and almost all threats of physical harm, are actionable under the statute. Attempted extortion is also proscribed by section 1951, so that it is not material for our purposes here whether or not fear was actually induced, or whether the property was in fact obtained by the defendant.

According to the government, the evidence demonstrated at least five separate Hobbs Act violations. The first deals with the payment of $33,000 that actually was made to Kattar. According to the testimony of Shervell, Kattar threatened through

Brower that if the $33,000 wasn't put into escrow, he would inform Flynn that the Church had attempted to bribe him into giving false testimony against Flynn. That information could, in turn, be used as ammunition in Flynn's litigation against the Church. Kattar's alleged threat thus implicated economic and public relations concerns of the Church.

A similar "economic" threat allegedly was made concerning the remaining $67,000, when Kattar threatened at the October 2d meeting to bring down the Church if Shervell did not cooperate.

The final "economic" threat allegedly occurred when a man identifying himself as Kattar informed a Church secretary over the phone that he would "go to the other side" if the $67,000 payment was not forthcoming.

As to these three allegations of extortion, Kattar argues that his threats were not "wrongful" under the meaning of the statute. According to Kattar, his agreement with the Church was to provide information that could implicate Michael Flynn in the check fraud, regardless of the veracity of that information. Kattar reasons that he was entitled to the money requested under the terms of this "contract" with the Church, and that certain forms of economic coercion are not "wrongful" under the Hobbs Act when the defendant has a right to the property in question. We address this argument in section III, *infra.*

The government also points to two separate incidents in which Kattar allegedly used threats of violence to attempt to obtain the $67,000. At the first meeting at which Agent DiMatteo was present, on October 2d, Kattar told Shervell and DiMatteo that he would "throw their names in the hat" if they did not go through with the exchange. According to both Shervell and DiMatteo, Kattar used a threatening tone of voice and demeanor in order to frighten them into parting with the remainder of the reward money. There was some testimony that Kattar stressed that he was in "the rackets." This characterization of Kattar's behavior was corroborated by Kattar in the

taped conversation he later had with Reservitz.

At the next meeting, Kattar did not make any direct threats of violence, but he did make a point to establish that he had substantial muscle at his disposal. He brought to the Church representatives' attention two of his associates who were standing guard over the meeting: the "big man," who "would blow your fuckin' head off in ten seconds," and "Dino," a "fuckin' animal" who'd "sit on his mother." This meeting was recorded on tape, and was introduced as evidence. It is unclear whether the show of intimidation was directly related to the demand for the $67,-000, but the jury could certainly have inferred such a connection.

Kattar concedes that threats of violence are unlawful under the Hobbs Act in a non-labor context even if the defendant has a valid claim of right to the property extorted. *See United States v. Porcaro*, 648 F.2d 753, 760 (1st Cir.1981); *United States v. Zappola*, 677 F.2d 264 (2d Cir.1982). He argues, however, that his threats of violence were specious and illusionary. His defense is that he had been warned that the Church was prone to use violence in its transactions. Victor Piscattello, a private investigator, testified that he earlier had told Kattar to watch his step with the Church, because the Church had been known to employ violence. Kattar's argument to the jury was that he had employed rough language not in order to extort the money from Church representatives, but instead to forestall any effort by the Church to do harm to him.

The jury was not asked for a special verdict on whether its finding of guilty was based on economic or physical extortion. Therefore, if either ground is found wanting, we must vacate the verdict. This comports with the rule that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those

grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983). *See also Stromberg v. California*, 283 U.S. 359, 367–70, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931); *United States v. Norton*, 808 F.2d 908, 911 (1st Cir.1987). We shall address in turn the defendant's challenges to the government's theories of extortion through economic threats and extortion through threats of violence.

### III.

Appellant first contends that the jury was improperly instructed on the circumstances in which a threat of economic harm may be the basis of a conviction for extortion. He claims that the jury should have been required to find that he had no entitlement to the funds obtained or sought before it could find him guilty.

■ A violation of the Hobbs Act requires the use of wrongful *means* to procure the property. A threat of economic harm—unlike the threat of physical harm[2]—is not per se wrongful; a legal right to the funds or property at issue may therefore justify the threat of pecuniary harm, depending on the sort of harm threatened. "Fear of economic loss is not an inherently wrongful means; however, when employed to achieve a wrongful purpose, its 'use' is wrongful." *United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981). A straightforward example of a lawful economic threat is where one party threatens litigation in order to persuade another party to honor a contract which the first party believes has been breached.

In this case, the challenged jury instructions were as follows:

You have to decide whether, as the government contends, the Church of Scientology parted with thirty-three thousand dollars of its money fearing that if they failed to do so, a threat to

---

**2.** Except in certain labor contexts, *see United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), using threats of violence to induce the payment of money is unlawful, regardless of the extortionist's possible legal right to the funds at issue. *See United States v. Porcaro*, 648 F.2d 753, 759–60 (1st Cir.1981).

give information to Michael Flynn would be carried out or whether, as the defendants contend, the Church wanted information incriminating Mr. Flynn regardless of its truth or falsity.

It's for you to decide whether, as the government contends, the defendants attempted to obtain another sixty-seven thousand dollars by threat that unless it were paid, information would be given to Mr. Flynn; and you have to keep in mind, of course, that the government has the burden of persuading you of all the essential elements of the crime charged beyond reasonable doubt and that the defendants have no burden to carry.

Appellant's dispute is only with the second paragraph. He claims that it was improper not to include in that paragraph a charge like that in the first, which would have suggested that the jury could not find Kattar guilty of economic extortion if "the Church wanted information incriminating Mr. Flynn regardless of its truth or falsity." Kattar's argument assumes that this case is simply a variation of the straightforward contractual/litigation situation described above. He claims that his agreement with the Church was to provide information regardless of its veracity. Because he met this obligation, he argues, he was entitled to the money, and this "legitimate entitlement" forecloses a conviction for economic extortion of that property. He claims that the challenged instruction improperly allowed the jury to find him guilty even if it believed Kattar was thus "entitled" to the $67,000. Appellant further argues that the acquittals on the fraud charges provide compelling evidence that the jury did believe that the defendant had a "legitimate entitlement" to the money.

Kattar's theory, however, fails; the facts of this case are *not* equivalent to a threat of litigation in response to a breach of a legal contract. Kattar was properly convicted for his threats to go to Flynn with damaging information against the Church, even if his agreement with the Church was to provide the information which he tendered regardless of its veracity.

■ We reject the idea that Kattar's asserted "agreement" with the Church could constitute a "legitimate entitlement" to the reward money. Any contract that was entered into between Kattar and the Church that Kattar would be paid $100,000 for false information, so that that information could be used to defame, ridicule and discredit Michael Flynn, is an illicit and unenforceable pact. Even if Kattar had some sort of claim to the money, such cannot be said to have been a "legitimate entitlement." We therefore conclude that *any* threat of pecuniary harm used to obtain the money would have been "wrongful," and thus a violation of the Hobbs Act. If the jury found that Kattar threatened to blow the lid on the Flynn incrimination scam unless paid the $67,000, then conviction was appropriate on a theory of economic extortion, even though there may have been an agreement to exchange the money for Kattar's false statements.[3]

The trial judge instructed the jury, in addition to the language quoted above, that the government had to prove that the defendant attempted to obtain money "without right to do so." The judge defined "wrongful," the crucial term in the statute, as "doing something without lawful claim or right." This instruction was more than sufficient. Kattar had no lawful claim to the $67,000, even if he did have some agreement with the Church.[4] The defend-

---

**3.** We do not mean to suggest that *no* economic threat is "wrongful" where there exists a legal right to the property obtained. Though litigation certainly is a lawful threat in response to a breach of contract, it is not obvious that every form of economic fear is equally legitimate, even where there is a "claim of right" to the property. However, because we reject Kattar's claim that he had a "claim of right" to the $67,000, we need not reach the question of whether Kattar's threat to go to Flynn would

itself have been "wrongful" even if he did have a legal right to the reward.

**4.** Implicit in Kattar's briefs is the contention that, whether or not there was in fact a claim of right to the money, Kattar himself *thought* he had such a right. Even if such a distinction were material, however, Kattar did not argue this theory to the jury, nor ask for a particular instruction regarding it. The judge properly instructed the jury that a necessary element of extortion is that the defendant act willfully and

ant was, in fact, benefited by the court's very generous instructions. The judge did not inform the jury that Kattar's alleged "deal" was in fact unlawful; the jury may have concluded incorrectly that it was legal. More significantly, the judge implied, as quoted above, that there was *no* extortion of the *$33,000* if, "as the defendants contend, the Church wanted information incriminating Mr. Flynn regardless of its truth or falsity." This was an error in the defendant's favor. He cannot now be heard to complain on the ground that the same error was not repeated in the instruction regarding the remainder of the money that he attempted to obtain.

## IV.

Appellant's next contention is that the government knowingly elicited false testimony. Kattar claims that this false testimony materially discredited his defense to the charges of extortion through fear of physical harm, and thus violated his right to due process. He specifically challenges three rulings of the district court made in response to his arguments on this issue at trial. We first describe the background of the issue, and then turn to the district court's rulings.

Regardless of any possible claim of right to the property extorted, threats of violence are always, except in certain limited labor circumstances, wrongful under the Hobbs Act. *See supra* note 2. Defendant's counsel did not, and could not, deny the threats of physical harm made by Kattar—they were loud and clear on the recorded conversations played for the jury. Instead, Kattar's defense was that these threats were idle and groundless, and that he had been forced to "talk tough" purely as a defensive, prophylactic matter. The defense theory was that Kattar knew that the Church in the past had used violence against its enemies, and that he was afraid that if the deal fell through, he might be subject to its retaliatory attacks. His violent outbursts and threats were, his counsel argued, meant not to extort the money

owed him, but instead to forestall any effort by the Church to do harm to him. A former Church private detective testified that he had told Kattar that the Church could be very dangerous, had been known to use violence, and allegedly once had bombed someone's premises.

Appellant complains that the government knowingly elicited testimony from witness Geoffrey Shervell that falsely characterized the Church as a reformed organization. On direct examination, Shervell acknowledged that there had been serious illegal activities conducted on the part of the Church by some of its highest ranking officials in the 1970s. Shervell contended, however, that this activity was isolated and contrary to Church policy, and that there had since been instituted a system of reform, in which he allegedly took part, designed to clean up the operations of the Church. He claimed that the investigations section of the Church, in which he was working during the time of the Kattar negotiations, was a benign group that was not involved in any illegal activities. The overall gist of Shervell's testimony was that the Church had undergone a substantial "reformation" since the law-breaking days of the 1970s.

Most significantly for purposes of this appeal, Shervell claimed that the "Fair Game Policy" of the Church had been discontinued shortly after its implementation in 1967. That policy, according to an official policy letter from the office of Church leader L. Ron Hubbard, instructed that "enemies" of the Church "[m]ay be deprived of property or injured by any means by any Scientologist without any discipline of the Scientologist. [The enemy may] be tricked, sued or lied to or destroyed." Shervell testified that this policy was not in effect during either the activities of the late 1970s or the time of his negotiations with Kattar in 1984.

Kattar contends that Shervell's characterization of the Church activities was false and deceptive. He claims that the Fair Game Policy, in spirit if not in name, was

---

purposefully, "with an intention to do something forbidden by the law." Such an instruction, along with the court's generous definition of "wrongful," was more than sufficient.

alive and well during the Church investigation of the check fraud, and that the Church investigation was designed to destroy the "enemy" Michael Flynn. Kattar introduced substantial evidence to show that the Church had been trying to "destroy" Flynn through the use of voluminous false information that they had disseminated about him.

The basis for Kattar's due process claim is that the prosecution elicited Shervell's characterizations of the Church despite the government's own knowledge that those descriptions were distorted. Kattar suggests that, as a result of these mischaracterizations, the jury would have been less likely to believe his defense that he had to threaten physical harm to protect himself from Church retributory violence. In particular, Kattar contends that the government itself did not believe that the crimes committed by Church members in the 1970s were mere isolated indiscretions contrary to Church policy, but instead knew that these incidents were fully consistent with and authorized by the official instructions and teachings of the Church hierarchy. Kattar further contends that the government believed the Fair Game Policy to have continued in effect not only throughout the 1970s, but also through the period of time during which the Kattar/Flynn episodes took place.

The evidence offered by Kattar to demonstrate that the government's own beliefs about the Church conflicted with those testified to by Kattar consists of the following:

In the late 1970s, the United States successfully prosecuted a number of high-level Scientologist operatives for various crimes involving illegal break-ins, burglaries, and wiretaps. In one of those cases, *United States v. Kember and Budlong*, No. 78–401(2 & 3) (D.D.C.), two Church officials were convicted of nine counts of aiding and abetting burglary in the second degree. In its sentencing memorandum in that case (the *"Kember* memo"), submitted to the federal court in 1980, the Justice Department characterized the defendants' "brazen and persistent burglaries and thefts" as "but one minor aspect of the defendants' wanton assault upon the laws of this country," and noted that the defendants' crimes were "of a breadth and scope previously unheard." The memo described the defendants as highly placed officials of the Church, and claimed that their operations were performed with the full authority and approval of the Church. The memo accused the Church and its members of considering themselves "above the law," with "carte blanche to violate the rights of others, [and] frame critics in order to destroy them." The Church, according to the U.S. Attorney, "launched vicious smear campaigns ... against those ... perceived to be enemies of Scientology." The Church's methods for this included the subornation of perjury. The memo also acknowledged the existence of the Fair Game doctrine as the active animating philosophy of the Church.

This characterization, even where it does not technically contradict Shervell's testimony, certainly does cast the Church in a radically different light from that used by the prosecution in the instant case.

A more direct and substantial contradiction of Shervell's testimony was contained in a brief filed by the United States in February 1986, more than one year after the events in question here took place, in a civil case instituted by the Church against the F.B.I., *Founding Church of Scientology of Washington, D.C. v. Webster*, 802 F.2d 1448 (D.D.C.1986). In that brief (the *"Webster* brief"), the government again asserted that the illegal activities of high-level Scientologists in the 1970s were carried out under the orders of the Church hierarchy, and pursuant to explicit policy directives issued by the Church. More significantly, in a footnote, the government alleged that the Church "continues to pursue" (in 1986) the Fair Game Policy, "as the action against Flynn, Sullivan and others referenced in the text attests." This directly contradicts Shervell's testimony, and in fact strongly suggests that the Fair Game Policy was in effect as to Michael Flynn during this time period.

The defense brought this brief to the government's and the court's attention after Shervell's direct examination, and moved for dismissal. That motion was denied. The defendants then moved for discovery of additional evidence in the government's possession that may have been the basis for the claims in the brief. This motion also was denied. Finally, the defendants asked that the government's statements be introduced into evidence. The trial judge allowed defense counsel to use the document on re-cross, but excluded it from evidence, even in a redacted version.

Appellant argues that each of the three rulings by the court was improper. We address each in turn.

### A.

■ A conviction obtained by the knowing use of false or perjured testimony "is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). It is immaterial that the particular prosecutor in this case may not have known about the evidence that revealed Shervell's testimony as possibly false. The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). At any rate, the United States Attorney in this case was made aware of the *Webster* and *Kember* briefs after direct examination of Shervell, and yet continued on redirect to elicit testimony which, at least in spirit, contradicted the government's asserted position in the District of Columbia proceedings.

A more difficult issue is whether Shervell's testimony was in fact false or perjurious. For the most part, the differences between Shervell's account of Church policies and those of the government in its other briefs are differences of characterization. In its actions against the Church, the government naturally attempted to paint the Church in the most prejudicial light possible. In its litigation against Kattar, the government not surprisingly tried to downplay the dark side of the Church so as to make Kattar's actions seem more fraudulent.

■ This inconsistency is troubling where its source is the prosecutorial arm of the federal government. It is one thing for private counsel to characterize events in contrasting ways in two separate litigations, because the counsel there is required under our adversary system to defend its clients in the most vigorous fair manner possible—counsel is expected to put the best possible gloss on a client's case. The function of the United States Attorney's Office, however, is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial. If it happens that the government's original perspective on the events in question is proven inaccurate, such revelation is in the government's interest as well as the defendant's. The criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth. *See* Brennan, *The Criminal Prosecution: Sporting Event or Quest for Truth?*, 1963 Wash.U.L.Q. 279. *See also Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397 (use of perjured testimony involves "a corruption of the truth-seeking function of the trial process"). This principle and this ideal are reflected in the constitutional requirement that the government make available to the defendant all material evidence favorable to the accused. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

■ Thus, it is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an organization, individual, or series of events variously as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations. Having previously acknowledged the Church's illegal practices and maintenance of the Fair Game Policy,

the prosecution should not have attempted in this case to describe the Church as a righteous organization without any designs to unfairly discredit its enemies, in order that the defendant's actions would seem more egregious. The government, of course, was free to argue that the Church's activities were immaterial to the events in question, but it should not have pretended that those activities were mere blights on an otherwise spotless history.

Nevertheless, the government's inconsistent positions do not rise to the level of constitutional error in regard to Kattar's conviction. To begin with, we are reluctant to conclude that most of Shervell's testimony was false or perjurious, even when compared to the government's previously stated conclusions about the Church. Shervell acknowledged the convictions in the 1970s, and admitted that the Church frequently attempted to defame Michael Flynn on the basis of patently untrue testimony. The significant difference between Shervell's testimony and the government's previous assertions lies in characterization, in the degree of significance attributed to the Church's illicit activities. Most of Shervell's testimony was, therefore, technically not untruthful.

More serious were Shervell's repeated claims that the Fair Game Policy was not in effect at the time of the check scheme operation. The government, in footnote 20 of the *Webster* brief, explicitly contradicted this assertion. Even though Shervell presumably could not be prosecuted for perjury unless it was shown that he himself knew that the policy was still in effect, the government is precluded from using evidence that is known *to the government* to be false. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (government "may not knowingly use false evidence, including false testimony"). Shervell's testimony about the Fair Game Policy should not have been elicited by the U.S. Attorney, given that the government itself contended elsewhere that the policy remained in effect through-

out the period in question. When the U.S. Attorney was made aware of the *Webster* brief, he should have made an attempt to correct Shervell's testimony in this regard during subsequent redirect examination. *Cf. id.* (conviction must fall when the prosecution, "although not soliciting false evidence, allows it to go uncorrected when it appears").

This conclusion alone, however, is not sufficient to require a new trial. The verdict must be set aside only if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. We are required to apply "a strict standard of materiality" in making this determination. *Id.* at 104, 96 S.Ct. at 2397–98. As Justice Blackmun noted in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), false testimony should be considered material "unless failure to disclose it would be harmless beyond a reasonable doubt." *Id.* at 680, 105 S.Ct. at 3379.[5] Even under this stringent standard, the false testimony here is not fatal to the conviction, primarily because it appears that the jury rejected that testimony. It is eminently clear that the jurors' verdict on the extortion count was entirely unrelated to any view they may have had regarding the Fair Game Policy or the Church's activities generally. In fact, the verdict of not guilty on all the fraud counts strongly suggests that the jury did not believe Shervell as to the clean hands and good intentions of the Church. If the jury had convicted on those counts, the false testimony likely would have constituted a due process violation sufficient to necessitate a new trial on those charges. But the jury evidently believed the defense's theory that the check scheme investigation was closely associated with the Fair Game Policy.

In addition, the evidence overwhelmingly supported the jury's judgment that Kattar's clear threats of physical harm were not made in self defense. The tape recordings show no evidence of a man fearing for

---

5. Although the section of *Bagley* from which this language is taken was joined only by Justice O'Connor, the particular proposition quoted was not in any way disputed by the other Justices.

his physical safety. They reveal a man of overwhelming confidence and swagger. At no point does Kattar sound frightened of the Church. In a discussion with Reservitz on October 3, 1984, the tape picks up the conversation apparently right after Kattar has told Reservitz that he has been informed of the Church's violent tendencies:

> Reservitz: Good. I don't really think that will be a problem. I don't think that's their style.
>
> Kattar: He tells me they bomb guys. I said I'll blow the whole fuckin' Church up. I said I want these guys to take a look at you.
>
> Reservitz: They bomb people?
>
> Kattar: That's what he says.
>
> Reservitz: Oh. I don't know that much about him.
>
> Kattar: Who gives a fuck? All my life I've lived with those kind of people.
>
> Reservitz: Well, I met these people. The people I met didn't seem like they could bomb themselves, never mind anybody else. I mean, that guy Geoff, the Englishman, he didn't seem like he bothered a soul.
>
> Kattar: He's the guy I's told "I'll break your fuckin' head." He's the one that got smart.

These are not the words of a man who's running scared. And even if the jury had been persuaded that Kattar feared the Church, the evidence overwhelmingly indicated that his threats were not made as a response to that fear, but rather as a means of collecting the money.

More significantly, any testimony of Shervell that the Fair Game Policy *was* still in effect would have added nothing to Kattar's defense. That defense concerns Kattar's own state of mind. Whether or not the Church actually continued the official policy is immaterial to what Kattar *thought* about the Church. The fact that the *government* believed the Church to be a ruthless organization adds nothing to the jury's understanding of what Kattar's ideas about the Church were, except that it might have slightly supported the credibility of the detective who testified that he told Kattar of the Church's dangerousness. It is beyond any doubt that the false testimony had no material effect on the jury's findings as to either Kattar's motives or his threats of violence. Therefore, for the purposes of this conviction, even the strict standard of materiality has not been met. The government's use of the false testimony had no effect on the extortion verdict.

Appellant also argues that revelation of Shervell's false testimony could have tarnished Shervell's credibility. The principle of not allowing the knowing use of false testimony "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). But even if this exposure would have completely impeached Shervell as a witness, the remaining evidence was beyond a doubt sufficient to convict on the extortion count. The tape recordings are proof positive of Kattar's threats, and the testimony of Agent DiMatteo independently establishes the threats at the October 2d meeting. As the government admits, the most logical way to interpret the jury's mixed verdict is that they disbelieved Shervell (hence, acquittal on the fraud counts), but believed DiMatteo and the tape recordings (leading to conviction on the extortion charge). Shervell's testimony was not at all crucial to the conviction obtained.[6] Even if the false testimony had come to light, there is no doubt that the jury would have returned the same verdict.[7]

---

6. There was also sufficient evidence to support a finding of economic extortion even if Shervell had been discredited. Kattar himself boasted to Reservitz that he had told the Church representatives "[Y]ou gotta fuckin' deal with me. You're not gonna back out. Your whole fuckin' church is coming down." In addition, the church secretary testified that someone identified as Kattar had in a telephone call threatened to "go to the other side" unless Shervell followed through on the deal.

7. Appellant also argues that the government should have been "judicially estopped" from changing its characterization of the Church from that which it alleged in the previous litigation. The doctrine of judicial estoppel, sometimes known as the doctrine of preclusion of inconsistent statements, prevents a party from

### B.

■ The defendants moved at trial for discovery of all documents in the possession of the government that formed the basis of the statements at issue in the *Webster* brief and in the *Kember* sentencing memorandum. These motions were denied. We agree with the trial judge that the basis for the government's assertions in those documents is provided in relevant part in the documents themselves. The government supported its accusations against the Church by citing numerous incidents and litigations that gave rise to their characterizations of the Church's policies and practices. It would not have been in the government's interest to omit any significant bases for its assertions, since it had a stake in persuading the federal judges in those two cases of their veracity. The Justice Department could ill afford to rest on mere conclusory statements.

It was well within the district court's discretion to decide that any further search through the voluminous government files on the Church of Scientology would be a mere fishing expedition, and likely would reveal nothing more than what was already included in the government memoranda. In any event, any further evidence on the nature of the Church's policies would not have assisted appellant in disproving the extortion charge. As we explained above, conviction on that count was obtained wholly independent of the debate concerning the true character of the Church; the entirety of the United States' files on the Church could reveal nothing that would have affected the jury's determination of what Kattar thought or how he acted.

### C.

Appellant argues that he should have been permitted to introduce into evidence the government's statements regarding the Church in the *Kember* memo and the *Webster* brief, as admissions of a party opponent under Rule 801(d)(2) of the Federal Rules of Evidence. An admission by a party opponent is not hearsay under that rule if the statement is either

> (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption of belief in its truth, or ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship....

Appellant contends that the government statements are admissible under subsections (B) and (D).

■ We first must determine whether the government is a "party-opponent" for purposes of this rule in a criminal case. We agree with Judge Bazelon that "the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases." *United States v. Morgan*, 581 F.2d 933, 937 n. 10 (D.C.Cir.1978). We can find no authority to the contrary or reason to think otherwise. Whether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases, *cf. United States v. American Tel. & Tel.*, 498 F.Supp. 353, 356–58 (D.D.C.1980) (civil case), the Justice Department certainly should be considered such. *Cf. Giglio*, 405 U.S. at 154, 92 S.Ct. at 766.

■ Kattar initially argues that the briefs in question contained admissions of "agents" of his party-opponent, and were therefore admissible under Rule 801(d)(2)(D). *See* 4 D. Louisell & C. Muel-

---

asserting a position contrary to a position taken by that party in an earlier proceeding. *See Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 211–15 (1st Cir.1987); 1B *Moore's Federal Practice* ¶ 0.405[8] at 238–47 (2d ed. 1984). In this circuit, the doctrine is only applied when a litigant is "'playing fast and loose with the courts.'" *Patriot Cinemas*, 834 F.2d at 212 (quoting *Scarano v. Central R. Co.*, 203 F.2d 510 (3d Cir.1953)). The government's conduct

here does not meet this standard. In addition, as far as we can tell, this obscure doctrine has never been applied against the government in a criminal proceeding. We need not decide whether the government could under any circumstances be so estopped, because we find that the inconsistency in this case was not sufficiently egregious, and was not material to the appellant's conviction.

ler, *Federal Evidence* § 426, at 328–29 (1980). We need not deduce the scope of Rule 801(d)(2)(D), however, because the statements here were admissible under Rule 801(d)(2)(B) as statements of which the party-opponent "has manifested an adoption or belief in its truth." The Justice Department here has, as clearly as possible, manifested its belief in the substance of the contested documents; it has submitted them to other federal courts to show the truth of the matter contained therein. We agree with Justice (then Judge) Stevens that the assertions made by the government in a formal prosecution (and, by analogy, a formal civil defense) "establish the position of the United States and not merely the views of its agents who participate therein." *United States v. Powers,* 467 F.2d 1089, 1097 n. 1 (7th Cir.1972) (Stevens, J., dissenting).[8] *See also United States v. Blood,* 806 F.2d 1218, 1221 (4th Cir.1986) (statements by government attorney during voir dire would be binding against the government if they had constituted a clear and unambiguous admission). The inconsistency of the government's positions about the Church should have been made known to the jury.[9] The government cannot indicate to one federal court that certain statements are trustworthy and accurate, and then argue to a jury in another federal court that those same assertions are hearsay. *See Morgan,* 581 F.2d at 937–38 & n. 11. *Cf. Powers,* 467 F.2d at 1097–98 (Stevens, J., dissenting).

We could find no indication in the record as to the reasons for the trial judge's exclusion of the redacted briefs offered by the defendants. They were not hearsay, for the reasons stated above, and they were certainly material to the defense, inasmuch as they undercut the government's assertions that the investigations by the Church

at the time in question were legitimate. A statement by the government that the Fair Game Policy was in effect at the time of the check scheme investigation would have been highly probative of the nature of the information sought by the Church; it likely would have completely undercut the government's assertion that Shervell was seeking only true and verifiable information from Kattar. It was therefore error to exclude those documents.[10]

■ Once again, however, Kattar's appeal fails at the threshold of materiality. Exclusion of the documents would have required reversal of any fraud convictions, but it had no material effect on the jury's verdict on the extortion count. Regardless of whether the Fair Game Policy was in effect, Kattar still threatened the Church officials with physical as well as economic harm. It is not clear that admission of the Justice Department briefs would have added anything to the jury's opinion of how *violent* the Church might be, the issue upon which appellant relied for his defense. But even if such admission had revealed that the government believed the Church to be dangerous, this would still have little bearing on Kattar's impression of the Church, or Kattar's reasons for making the threats. For this reason, his appeal must fail on this ground as well.

### V.

Finally, appellant argues that it was error for the trial judge to exclude the statements of two persons that were to be offered through the testimony of a private detective. The detective apparently would have testified that these two persons (both of whom were admittedly unavailable to testify) told her that they had been paid money by a Church operative (not Shervell)

---

8. Although disagreeing with Judge Stevens on the characterization of the assertions in that case, the majority in *Powers* suggested that it might have decided the case differently had there been proof "that the Government, as opposed to any individual thereof, had taken an inconsistent position earlier." 467 F.2d at 1095.

9. Indeed, because the prior assertions were made by representatives of the specific party-opponent (the Justice Department) itself, they

might be admissible as the party's own statements under Rule 801(d)(2)(A).

10. Of course, this sort of party-opponent admission is still subject to the trial court's balancing of its probative value against its prejudicial effect under Rule 403. We doubt that such a balancing would have weighed against admissibility in this case.

to provide false information implicating Flynn in the check fraud. For the same reasons as those stated above in regard to the government's prior assertions, these statements also would have been immaterial to the jury's deliberations on the extortion charge. Even if they had been material, however, the district judge was well within his discretion in finding insufficient "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement[s]." Fed.R.Evid. 804(b)(3). *See United States v. Hemmer,* 729 F.2d 10, 16 (1st Cir.1984).

## VI.

For the foregoing reasons, the judgment of conviction on the extortion count is *affirmed.*