**UNITED STATES of America,**
**Plaintiff,**

v.

**David LOPEZ–ORTIZ, Defendant.**

**Civil No. 08–310 (FAB).**

United States District Court,
D. Puerto Rico.

Aug. 31, 2009.

---

G. Andrew Massucco–Lataif, Olga B. Castellon–Miranda, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Plaintiff.

## MEMORANDUM AND ORDER

BESOSA, District Judge.

On September 2, 2008, a federal grand jury indicted seventy-four defendants for participation in a large drug conspiracy operating in the Altos de Cuba Ward in Vega Baja, Puerto Rico. (Docket No. 4) Among those charged with offenses related to that conspiracy was defendant David Lopez–Ortiz ("Lopez–Ortiz"), who moved for the suppression of $450.00 currency seized from him on July 1, 2008. In his suppression motion, Lopez–Ortiz alleged that the money was found as a result of an unlawful search of his person, in violation of the Fourth Amendment's protection against unreasonable searches and seizures. The government argued in its response that the seizure was lawful.

On April 22, 2009, the United States Magistrate Judge issued a Report and Recommendation ("R & R") (Docket No. 971), recommending that the defendant's motion to suppress be GRANTED. The United States objected to the R & R (Docket No. 1006) and requested a new hearing for this Court's *de novo* review of the suppression issue. Lopez–Ortiz responded to the government's objection to the R & R and objected to the government's request for a hearing. (Docket No. 1047) The Court granted the government's request for a *de novo* hearing (Docket No. 1113), which Lopez–Ortiz protested, moving to vacate the *de novo* suppression hearing. (Docket No. 1131) The Court denied the defendant's motion to vacate (Docket No. 1132) and held a suppression hearing on June 4, 2009. The following day, on June 5, 2009, Defendant Lopez–Ortiz submitted a memorandum (Docket No. 1166) in support of suppression.

Upon review of the R & R, the objections to it, and the new evidence raised at the June 4, 2009 suppression hearing, the Court finds no reason to depart from the magistrate judge's recommendations and accordingly **ADOPTS the R & R,** thereby **GRANTING** the defendant's motion to suppress the currency found on his person.

## I. Standard of Review for Objections to a Report and Recommendation

■ A district court may refer pending dispositive motions to a magistrate judge for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(a). Any party adversely affected by the report and recommendation may file written objections within ten days of being served with the magistrate judge's report. *See* 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop,* 389 F.Supp.2d 189, 191–92 (D.P.R.2005) (*citing United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Failure to comply with this rule precludes further review. *See Davet v. Maccarone,* 973 F.2d 22, 30–31 (1st Cir.1992). In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir.1985); *Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 146 (D.P.R.2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. *See Hernandez–Mejias v. General Elec.*, 428 F.Supp.2d 4, 6 (D.P.R.2005) (*citing Lacedra v. Donald W. Wyatt Detention Facility*, 334 F.Supp.2d 114, 125–126 (D.R.I. 2004)).

## II. Factual Background

The government has not objected to the magistrate judge's narration of the facts;[1] therefore the Court adopts the facts and recites them here verbatim for purposes of clarity:

The following facts are derived from the testimony given at the suppression hearing, as well as from the exhibits submitted at the hearing. The court heard testimony from the following witnesses: Puerto Rico Police Department ("PRPD") Agent Roberto Cruz, PRPD Agent Luis E. Vázquez–Torres, PRPD Agent Julio González–Colón, Drug Enforcement Administration ("DEA") Task Force Agent ("TFA") Pedro Pérez, DEA Agent Joseph Slesar, and the defendant.

PRPD Agent Roberto Cruz was assigned to the Bayamón Metro Strike Force and was involved in the investigation of a drug point operating in the Altos de Cuba Ward of Vega Baja. By July 1, 2008, he had received information from DEA Agent Slesar of drug trafficking and acts of violence at the drug point. He had received particular information from a confidential source that López–Ortiz worked as a runner

and that every morning the defendant would leave his house and proceed on foot to the drug point where he would deliver a certain type of heroin and pick up money corresponding to proceeds from the previous night's sales. Cruz also had received specific information about the route the defendant would take from his house to the drug point. Cruz personally had seen the defendant before at the Altos de Cuba drug point.

On the morning of July 1, 2008, Agent Cruz and other PRPD officers conducted a surveillance targeting López–Ortiz. Agent Cruz positioned himself in a car outside defendant's residence, while Agents Vázquez and González were stationed in a second car on Las Flores Street, which was further along the route toward the drug point. At about 6:15 a.m., Agent Cruz observed the defendant leave his residence and walk toward an alley on the side of Las Flores Street, in a route consistent with the information the agents had received. Agent Cruz lost sight of the defendant when he entered the alley, but he communicated the defendant's description and movements to the officers waiting in the car at Las Flores Street.

One of those officers was PRPD Agent Luis Vázquez Torres. Agent Vázquez testified that he observed López–Ortiz emerge from an alley and cross Las Flores Street, heading in the direction of the drug point. Agent Vázquez then lost sight of the defendant. Approximately ten minutes later, Vázquez observed the defendant come back into view, from the same direction, counting money. At that point, Agent Vázquez drove toward the defendant in his unmarked car. He asked the defen-

---

1. As further explained below, the government does object to the magistrate judge's credibility determinations as stated in the "findings of credibility" section of the R & R, findings which the factual background helps to explain.

dant about the money, and the defendant replied that he did not know the origin of the money. He also asked defendant for identification, but the defendant said he left his identification in his house. Vázquez then seized the money—$450, mostly in twenty dollar bills with some tens—from the defendant's hands. He then frisked the defendant for weapons but found nothing. Vázquez found the amount of the money to be suspicious since the agents had been informed that every morning the defendant would collect $500.00 from the drug point and give $50.00 to the seller, keeping $450.00. Moreover, there were no banks or automatic teller machines between the drug point and where Agent Vázquez lost sight of the defendant. Agent Vázquez later filed an incident report affirming that the defendant was intercepted "after coming out of the drug point area that is located at Alto de Cuba Ward counting money". (Exh. A). However, Vázquez conceded that he did not personally observe the defendant at the drug point nor did he witness the defendant engage in illegal activity on that date.

Agent Vázquez's testimony was largely corroborated by Agent Julio González, who was with him that morning. González confirmed that they had received information that López–Ortiz was a runner for a drug point, and that every morning he would leave his house and follow a specified route to the drug point, where he would deliver a bundle of heroin and pick up the previous night's tally, keeping $450.00 of the proceeds. González further testified that on the morning of July 1, 2008, he and Vázquez observed the defendant walking up Las Flores Street toward the drug point before losing sight of him; ten or fifteen minutes later the defendant came back into view counting the money. Agent Vázquez then intervened with the

defendant. Although Agent González testified that he did not see what Agent Vázquez did, he observed that "at some point" Agent Vázquez had the money in his hands.

The defendant, David López–Ortiz, told a much different story. He testified that on the morning of July 1, 2008, he awoke at about 6:00 a.m., got dressed, and went outside to start his car. He went back inside and got the $450.00 that was later seized from him, and then waited outside for his car to warm up. He testified that he was soon confronted by Agent Vázquez and another police officer, who with guns drawn searched him and took the money from his left pocket. They asked him about the money, and defendant stated that he was going to use it to pay debts. The agents said that the money was from selling drugs. López–Ortiz further testified that the agents escorted him to his house and entered the house without permission. He eventually signed a document about the seizure of the money. On cross examination, defendant stated that he was employed as a barber at a shop that opened at 7:00 or 8:00 a.m., depending on the day, but admitted he informed pre-trial services that he was unemployed. He stated that he intended to get in line at a Banco Popular branch to pay debts when the branch opened, and that he also intended to go to a nearby furniture store to pay debts. He denied that he walked to the drug point that morning and denied that he was counting money in the street.

The defendant also called as witnesses DEA Task Force Agent Pedro Pérez and DEA Agent Slesar regarding an affidavit executed by Pérez on August 14, 2008. That affidavit, which the government had submitted under seal to a magistrate judge of this court in support of an application for a search warrant

for defendant's residence, 1 relates a version of the events of July 1, 2008, that, in part, is materially different from the version provided by González and Vázquez. In particular, paragraph four of the affidavit states as follows:

"Based on the information supplied from the CHS1, members from the Bayamón Strike Force Unit identified the Target Location as the residence of López–Ortiz. On July 1, 2008, members of the Bayamón Strike Force established surveillance in the Area of Altos de Cuba, Vega Baja, Puerto Rico. Surveillance was established in an effort to corroborate the information gained from CHS1, to monitor and corroborate the drug related activities of David López–Ortiz. At approximately 6:00 a.m. of the same date, PRPD Agent Roberto Cruz, while conducting surveillance from a PRPD undercover vehicle stated via radio transmitter that David López–Ortiz departed the Target Location and was headed towards the Alto de Cuba drug point. PRPD Agent Julio González informed surveillance units, that López–Ortiz was walking towards the purported drug point in Altos de Cuba, Vega Baja, PR. After a while, PRPD Agent Julio González then observed López–Ortiz depart the area. PRPD Agent Roberto Cruz then observed López–Ortiz returning towards the Target Location. PRPD Agent González and PRPD Agent Luis Vásquez then approached López–Ortiz. **PRPO González stated that López–Ortiz was searched for security purposes for drug and firearms. PRPO González explained that at that time López–Ortiz was not in possession of drugs or firearms but Officers found $450 hidden in the waist area. . . . Upon questioning by the agents, López–Ortiz could not explain or justify, why he was in possession of the amount of U.S. Currency while exiting a high drug trafficking area.** PRPD Agent Vázquez as witnessed by PRPO González then seized the U.S. Currency via receipt, and then transferred it to the Puerto Rico Treasury Department for forfeiture purposes."

Importantly, the affidavit differs from the agents' hearing testimony in that: (1) it does not state that the agents saw the defendant counting the money; (2) it does not state that the money was seized from defendant's hands prior to the pat-down; and instead (3) states that the agents found the money hidden in the defendant's waist area after a pat-down failed to detect the presence of any weapons or drugs.

TFA Pérez testified that he and DEA Agent Slesar prepared the affidavit after interviewing members of the surveillance team. Agent Slesar, in turn, testified that he was responsible for drafting paragraph four of the affidavit, and that the information was obtained from his interview with Agent Pedro Colón, who was part of the surveillance team but who was not present when the evidence was seized. Nevertheless, Agent Slesar testified that the interview was conducted in Spanish—a language he claims not to be proficient in—and that during the course of the suppression hearing he came to realize that he had misunderstood the part about the agents finding the money in defendant's waist area during the pat-down.

Docket No. 971 (internal citations and footnote omitted)

## III. Government Objections to the R & R

The government objects to the magistrate judge's credibility assessments, and his subsequent conclusion that the search

of the defendant was unlawful, leading to an unlawful seizure of currency. The government also objects to the magistrate judge's admission of Agent Pérez's affidavit and, hence, the weight given to it by the magistrate judge in his R & R. In fact, the Court notified the parties at the outset of the June 4, 2009 suppression hearing that, "because the [magistrate judge's] credibility determinations were basically based on that affidavit," a *de novo* review of the magistrate judge's credibility assessments hinged on whether or not the Court agreed with the admission of Agent Perez's affidavit.[2] The Court therefore proceeds to decide, first, whether the magistrate judge properly admitted the contested affidavit.

## A. Agent Perez's Affidavit

At issue is the admissibility of an affidavit (described in the facts section above) executed by Agent Perez on August 14, 2008. The government submitted the affidavit both to a magistrate judge to support its application for a search warrant and in its opposition to the defendant's suppression motion. Essentially, the affidavit claimed that agents found the seized currency in the defendant's waist band area; yet during the suppression hearing held before the magistrate judge, agents testified that they saw the defendant counting money as he walked.

The magistrate judge determined that the affidavit of Agent Perez was admissible as an admission of a party-opponent pursuant to Fed.R.Evid. 801(d)(2).[3] The admissibility of government statements as admissions of party opponents has been controversial, provoking a split among the circuits. Although the magistrate judge noted that government agents or employees are generally not considered party-opponents in criminal prosecutions pursuant to Rule 802(d)(2) (see Docket No. 971 at 6 (internal citation omitted)), "relatively recently several federal courts have endorsed generally the use of inconsistent prosecutorial statements in concluding they are not *per se* inadmissible." See 2007 WL 1544152 (Idaho App.2007) (unpublished) (overview of case law); *see also, United States v. Bakshinian*, 65 F.Supp.2d 1104, 1105–08 (C.D.Cal.1999).

The Second Circuit Court of Appeals opened the door to admission of prosecutorial statements by holding in 1984 that defendant counsel's statements in criminal cases are admissible as party opponent

2. Upon reviewing the transcript of the suppression hearing, the Court notes that on numerous occasions during the suppression hearing it made clear to the parties that, although it would hear the evidence presented, the Court would make a legal determination regarding the affidavit's admissibility before deciding whether to consider new evidence and conduct a *de novo* review of the record related to credibility issues.

Importantly, neither party presented arguments during the hearing related to the affidavit's admissibility; the government indicates that it requested the hearing because if the magistrate judge's credibility findings were to stand, "it's going to follow these officers for the rest of their lives," insinuating that the R & R would damage the officers' careers. The Court wishes to note that considering the effect of the R & R's findings on an officer's legal career is not relevant to the determination of whether or not the defendant's Fourth Amendment rights were violated.

3. Pursuant to Fed.R.Evid. 801(d)(2) a statement is "not hearsay" if, in pertinent part: The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

admissions in subsequent trials where they are: (1) "assertion(s) of fact ... equivalent [to a] testimonial statement [ ] by the [client];" (2) "inconsistent with similar assertions in a subsequent trial;" and (3) not subject to an innocent explanation for the inconsistency. *United States v. McKeon,* 738 F.2d 26, 33 (2d Cir.1984). Soon thereafter the Second Circuit expanded its holding in *McKeon* to allow admission of prosecutorial statements, applying the same factors in admissibility determinations. *United States v. Salerno,* 937 F.2d 797, 811–12 (2d Cir.1991), rev'd on other grounds 505 U.S. 317, 322, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). Following the Second Circuit's decision to treat certain prosecutorial statements as party-opponent admissions, other federal courts of appeals have reached holdings allowing the admission of certain prosecutorial statements pursuant to the adoptive admissions exception. *See, e.g., United States v. Warren,* 42 F.3d, 647 (D.C.Cir.1994); *United States v. Kattar,* 840 F.2d 118 (1st Cir. 1988); *United States v. Morgan,* 581 F.2d 933 (D.C.Cir.1978).

In *Kattar* the First Circuit Court of Appeals joined those circuits allowing certain prosecutorial statements to be admitted pursuant to Rule 802(d)(2) as admissions of a party opponent. The First Circuit held that statements made in a government memorandum filed in a related case were admissible as party opponent admissions because they contradicted an earlier position taken by the government against defendant Kattar. According to the First Circuit's analysis, "the Federal Rules clearly contemplate that the federal government is a party-opponent for the defendant in criminal cases." *Kattar,* 840 F.2d at 130 (quoting *Morgan,* 581 F.2d at 937 n. 10). Further, the Court explained that where the Justice Department clearly manifests its belief in the validity of contested documents, in fact submitting them to other federal courts to credit their truthfulness, the assertions contained in those documents "establish the position of the United States and not merely the views of its agents who participate therein." *Id.* at 131 (internal citation and quotation omitted).

Citing the First Circuit's holding in *Kattar,* the magistrate judge found in this case that the government "twice manifested an adoption or belief in the truth and accuracy of Agent Perez's statement." (Docket No. 971 at 6) (internal quotation omitted). "First, the government submitted the affidavit in support of an application for a warrant to search the defendant's residence," and "[s]econd, the government adopted the contents of paragraph four of the affidavit in its opposition to defendant's motion to suppress." (R & R, Docket No. 971 at 6) Because "the government has twice presented [the affidavit's] contents to this court," and because those contents diverged from agent testimony during the suppression hearing regarding the location of the seized currency, the magistrate judge allowed the affidavit to be admitted as the admission of a party-opponent.

■ The government, in its opposition to the R & R, offers no persuasive argument refuting the magistrate judge's legal analysis on this matter.[4] The government

---

4. In its argument that the affidavit should not be admitted because it is not relevant, the government oddly cites to Rule 608(b) (regarding the impeachment of witnesses) and Rule 613 (regarding prior inconsistent statement). Relevance is generally considered pursuant to Rule 401 and exclusion under Rule 403. As the government fails to offer any analysis as to why the affidavit would be irrelevant or should be excluded pursuant to these rules, and because the Court views the affidavit as clearly relevant to the issue of whether or not the government's search of the defendant was a lawful one, the Court rejects the government's assertion that the affidavit be excluded for lack of relevance.

argues that the affidavit contains inaccurate information as a result of poor communication between agents present at the time of the search and seizure and agents who ultimately created the affidavit.[5] This line of argument—the factors leading to the affidavit's inaccuracies—is irrelevant. What matters in the analysis under *Kattar* is whether the government submitted the contested statements for their truth in one forum while denying their truth in another. Here, the government has done just that and, therefore, this Court agrees that the affidavit was properly admitted as a party admission.

The government attempts to distinguish the facts of this case from those in *Kattar.* The government explains that the court in *Kattar* "determined that the United States should have made efforts to correct the false testimony on re-direct." The Court assumes the government intends to imply that the agents here did correct the record by explaining why the affidavit was incorrect and, therefore, somehow, the affidavit ought to be excluded. The government's argument here is both misleading and unconvincing. First, and most importantly, *Kattar* does not say that if the government corrects its inaccurate statements, those statements are no longer admissible pursuant to Rule 802(d)(2) as a party opponent admission.[6] The government's position ignores the Court's clear determination in *Kattar* that "the inconsistence of the government's positions ... should have been made known to the jury." The government's attempts to explain or justify inaccuracies in the affidavit may certainly be relevant in the weighing and assessing of credibility, but the reasons for those inaccuracies are irrelevant to the analysis of admissibility determinations under Rule 802(d)(2).

Secondly, the government opposes admission of the August 14, 2008 affidavit because an earlier July 1, 2008 police report affirmed the government's version of events—in which the agents observed the defendant counting money as he walked. The government explains that "there is nothing to suggest that the Police Report and the testimony of the arresting Officers is not to be believed." (Docket No. 1006 at 13) The Court also views this argument as irrelevant to the legal analysis set forth in *Kattar* for determining the affidavit's admissibility. The government's unsurprising disappointment with the magistrate judge's decision to credit those parts of the affidavit least favorable to the government do not factor into this Court's decision regarding the affidavit's admissibility as a party opponent admission. The magistrate judge's admittance of Agent Perez's August 14, 2008 affidavit was cor-

---

**5.** Among other factors, the government cites as reasons for the affidavit's inaccuracy: (1) the officers on the scene were not interviewed by the affiant, Agent Perez; (2) Agent Perez did not himself draft the contested paragraph in the affidavit and instead relied on the translation and memory of another agent, Agent Slesar; and (3) Agent Slesar has admitted to possessing imperfect Spanish translation skills. (Docket No. 1006 at 11)

**6.** In fact, in attempting to distinguish *Kattar* from this matter, the government cites to a section of *Kattar* unrelated to *Kattar* 's discussion of Rule 802(d)(2). The section of *Kattar* from which the government quotes condemns the government's continued solicitation of false testimony during a witness's redirect examination that the government knew contradicted earlier government statements previously submitted to another court. Nowhere does the First Circuit say in *Kattar* that the previously submitted statements would be inadmissible pursuant to Rule 802(d)(2) if only the government had attempted to cure the false testimony. The government citation to this section of *Kattar* as a reason to distinguish the facts in the instant matter reveals either a misunderstanding of the holding in *Kattar* relevant to 802(d)(2) or an attempt to mislead this Court.

rect; therefore the magistrate judge correctly included the affidavit in making his credibility determinations.

## B. Credibility Determinations

■ Following an evidentiary hearing held on March 4, 16, and 18, 2008, the magistrate judge concluded that officers found $450.00 "hidden in the defendant's waist area when they patted him down and failed to find drugs or weapons." (R & R, Docket No. 971 at 9) Following this determination, the magistrate judge went on to recommend that the defendant's motion to suppress the currency be granted because the government overstepped the bounds of a legal pat-down search by continuing to search the defendant when no weapons were found.

Objecting to what it views as an arbitrary crediting of various portions of agent testimony, defendant testimony, and documentary evidence, the government asks this Court to reject the magistrate judge's assessment of credibility. The Court declines the government's invitation. The Court generally will not disturb the credibility determinations of a magistrate judge. *See United States v. Hernandez–Rodriguez*, 443 F.3d 138, 148 (1st Cir.2006) (holding that a district court may not reject a magistrate judge's credibility findings related to a witness without hearing the witness).

Faced with conflicting versions of the events surrounding the defendant's search and the ultimate seizure of currency, the magistrate judge awarded more credibility to the defendant's and to the affidavit's versions of events regarding the pat down than those of the officers. The R & R rejects Agent Slesar's explanation that the affidavit was incorrect as a result of the agent's lacking Spanish skills. As noted in his R & R, "the court is lacking any explanation why the only detail that was misinterpreted [in the affidavit] happens to be the one that the government now wishes to disavow." (R & R, Docket No. 971 at 8)

The Court sees no reason why it should tamper with these appraisals of the testimony and the witnesses heard by the magistrate judge during the course of a three-day suppression hearing. The government essentially objects to the obvious incredulity with which the magistrate views the agents' version of events. The magistrate judge's conclusions may not be pleasing to the government, but they are based on supportable impressions of credibility which the magistrate judge was in the best position to make. Furthermore, this Court arrived at the same conclusions after independently reviewing the record, including the transcripts from the initial suppression hearing, and after hearing from additional witnesses in a June 4, 2009 suppression hearing. The agents who testified on June 4, 2009 before this Court regarding the location of the seized currency on the defendant's person were no more believable than the agents who testified before the magistrate judge. In fact, the additional witness testimony supports the initial findings of the magistrate judge: the testimony of both Agent Colon–Burgos and Agent Vazquez–Torres on June 4, 2008 impressed this Court as contrived and incredible. Therefore the Court agrees with the credibility determinations made by the magistrate judge's and **ADOPTS** in full his recommendation to **GRANT** the defendant's motion to suppress.

## CONCLUSION

The Court has made an independent examination of the record in this case and, finding that the defendant's Fourth Amendment rights were violated by the unlawful search of his person, accordingly

GRANTS the defendant's motion to suppress.

**IT IS SO ORDERED.**